Tommaso BUTI and Fashion World
Company, Plaintiffs,

v.

IMPRESSA PEROSA, S.R.L., Defendant.

No. 95 Civ. 3525 (AGS).

United States District Court,
S.D. New York.

Aug. 9, 1996.

Samuel I. Burstyn, Miami, FL, Robert W. Cinque, Cinque & Cinque, P.C., New York City, for Plaintiffs.

David Jaroslawicz, Jaroslawicz and Jaros, New York City, for Defendant.

### MEMORANDUM DECISION

SCHWARTZ, District Judge:

Before the Court is Magistrate Judge Peck's Report and Recommendation urging that the Court grant plaintiffs Tommaso Buti and Fashion World Company (collectively "Buti")—owners of the "Fashion Cafe" in Rockefeller Center in Manhattan—summary judgment on their action seeking a declaratory judgment that defendant Impressa Perosa, S.R.L. ("Impressa")—owner of a "Fashion Cafe" in Milan, Italy—does not have rights in the trademark "Fashion Cafe" for restaurant services and clothing in the United States. Magistrate Judge Peck also recommends that the Court grant Buti summary judgment dismissing Impressa's federal trademark counterclaims with prejudice and its state law claims without prejudice. Finally, Magistrate Judge Peck recommends that certain portions of the affidavit of Impressa attorney David Jaroslawicz be struck, and that Buti's request for sanctions be granted in part. For the reasons set forth below, the Court adopts the Report and Recommendation, except for its recommendation regarding the imposition of sanctions.

### BACKGROUND

The Magistrate Judge thoroughly and accurately describes the facts underlying this action, see Report and Recommendation at pp. 3–12, and they will not be repeated here. In a well-reasoned Report and Recommendation, the Magistrate Judge recommends that this Court grant Buti's summary judgment motion as to Impressa's federal trademark counterclaims because Impressa did not "use" the mark "Fashion Cafe" in the United States prior to Buti's trademark registration and use. The Magistrate Judge further recommends that Buti be awarded a declaratory judgment that Impressa does not have any trademark in the name "Fashion Cafe" in the United States, and that Buti did not infringe any such rights.

With regard to Buti's motion to strike certain affidavits submitted by Impressa and his request for sanctions, Magistrate Judge Peck recommends that certain portions of the affidavit of Impressa's attorney David Jaroslawicz be stricken, and that Buti's request for sanctions be granted "to the limited extent of the reasonable cost of researching and preparing that portion of the motion to strike dealing with defense counsel's affidavit." Report and Recommendation at 34–35.

Impressa has timely filed objections to the Magistrate Judge's Report and Recommendation. After consideration, the Court rejects all of the objections, except those regarding the imposition of sanctions.

### DISCUSSION

#### I. Disposition of Lanham Act Claims

The Court has conducted a de novo review of the record and arguments considered by the Magistrate Judge and concludes that the Magistrate Judge's recommendations regarding disposition of the Lanham Act claims should be adopted by this Court. As Impressa recognizes, the critical issue with respect to the Lanham Act claims asserted by each party is whether the plaintiffs or the defendant were first to use the name "Fashion Cafe" in commerce, as the phrase "use in commerce" is defined in the Lanham Act, 15 U.S.C. § 1127. See Defendant and Counterclaim Plaintiff's Objections to the Magistrate Judge's Report and Recommendation ("Objections") at 3.

■ The Court agrees with the Magistrate Judge's conclusion that the activities engaged in by Impressa officer Giorgio Santambrogio—including advertising and promotion of the Milan "Fashion Cafe" unconnected to an established United States business [1]—do not

1. The Magistrate Judge also rejected Impressa's

argument that its negotiation for future "Fashion

constitute "use in commerce" in the United States so as to confer upon Impressa rights in the "Fashion Cafe" mark in the United States. Rather than ignoring the definition of "use in commerce," as Impressa contends, the Magistrate Judge's Report and Recommendation refers to and quotes the statutory definition, and cites case law interpreting it. *See* Report and Recommendation at 14.

■ The Report and Recommendation begins its analysis of the trademark priority issues by referring to the territoriality doctrine, under which a trademark is recognized as having a separate existence in each sovereign territory in which it is registered or legally recognized as a mark. Thus, it is clear that Impressa does not derive any right to the "Fashion Cafe" mark in the United States from either its trademark registration of "Fashion Cafe" in Italy in 1988 or from its operation since 1987 of the Milan "Fashion Cafe."

The Report and Recommendation addresses the effect of Impressa's efforts to advertise and promote the Milan "Fashion Cafe" in the United States. Magistrate Judge Peck concludes that (1) "mere advertising" unconnected to an established business is not "use" under the Lanham Act, and (2) United States advertising of a foreign business is not "use" of the mark in the United States. Noting that the federal courts do not appear to have addressed the second issue, Magistrate Judge Peck points out that decisions of the Patent and Trademark Office's Trademark Trial and Appeal Board ("TTAB") have resolved the issue adversely to Impressa's posi-

tion in this litigation.[2] After summarizing the holdings of these decisions, the Magistrate Judge concludes that although there was advertising of the Milan "Fashion Cafe" in the United States, such advertising only had an impact on commerce in Milan; all restaurant services were rendered there, any profit flowed there, and one must be in Milan to avail oneself of the restaurant services. Report and Recommendation at 19 n. 8. Thus, the Magistrate Judge concluded, "there is no impact on United States commerce and no use or rights to the mark in the United States."[3] *Id.* The Court agrees, and rejects Impressa's argument (unsupported by any directly relevant authority) that the distribution of vouchers for free meals (among other promotional activities) satisfies the Lanham Act's definition of "use in commerce," when Impressa rendered no restaurant services in the United States and its activities had no impact on United States commerce.

In the Court's view, the Magistrate Judge's conclusions and recommendations constitute an entirely correct resolution of the trademark issues. Accordingly, the Court adopts Magistrate Judge Peck's recommendations regarding disposition of the Lanham Act claims.

## II. *Dismissal of State Law Counterclaims*

Impressa also argues that the Report and Recommendation is erroneous to the extent that it recommends the dismissal of Impressa's state law counterclaims "without prejudice". Impressa contends that there is di-

Cafe" restaurants at various U.S. hotels or with United States restaurateurs before the opening of Buti's New York "Fashion Cafe" constitutes use of the mark in the United States. Report and Recommendation at 21 n. 10. Impressa contends that the Report and Recommendation "appears to have overlooked" Impressa's arguments that negotiating for a "Fashion Cafe" constitutes use in commerce. Objections at 6 n. 5. However, it is clear that the Magistrate Judge considered and explicitly rejected these arguments.

2. The Magistrate Judge recognized that decisions of the TTAB are not binding on this Court, but are nevertheless entitled to great weight. Contrary to the assertions of Impressa, nothing about the Magistrate Judge's reliance on the two TTAB decisions is improper. Rather than being inap-

posite, these decisions are directly on point and provide strong support for the Magistrate Judge's recommendation.

3. The Magistrate Judge also considered the applicability of two exceptions to the general rule, enunciated in the TTAB cases, that United States advertising of a foreign business is not "use" in the United States. First, the Magistrate Judge concluded that Impressa was unable to show bad faith on the part of plaintiffs in adopting the "Fashion Cafe" mark. Second, the Magistrate Judge concluded that the Milan "Fashion Cafe" is not well known in this country and therefore does not qualify for the exception afforded "famous" marks. The Court joins in both of these conclusions.

versity or alienage jurisdiction[4] over these claims, and that the Magistrate Judge overlooked this basis of jurisdiction when he recommended that the Court decline to exercise supplemental jurisdiction over Impressa's state law counterclaims. The Court rejects this objection for the reasons set forth below.

First, the Court notes that Impressa failed to explicitly plead diversity jurisdiction in its Answer and Counterclaims. It is firmly established that diversity of citizenship "should be distinctly and positively averred in the pleadings, or should appear with equal distinctness in other parts of the record." *Leveraged Leasing Admin. Corp. v. Pacifi-Corp Capital, Inc.*, 87 F.3d 44, 47 (2d Cir. 1996) (citation and internal quotations omitted). Impressa now seeks to invoke the Court's diversity jurisdiction by making jurisdictional allegations in its Objections to the Magistrate Judge's Report and Recommendation. Despite the deficiencies in Impressa's pleading regarding diversity jurisdiction, the Court has addressed the merits of Impressa's jurisdictional argument.

A careful review of the case law regarding the effect of a 1988 amendment to the diversity statute on the scope of alienage jurisdiction leads to the conclusion that there is no basis for such jurisdiction in this lawsuit between an Italian citizen and a New York limited partnership, on one side, and an Italian corporation, on the other.

■ It appears undisputed that Impressa is an Italian corporation, Complaint ¶ 3, and that Plaintiff Fashion World Company is a New York Limited Partnership.[5] Complaint ¶ 2. The citizenship of Buti for diversity jurisdiction purposes is not nearly so clear. Impressa argues that Buti, an Italian citizen in the United States on a permanent visa, should be considered a citizen of New York for the purposes of diversity jurisdiction because he is domiciled here. Objections at 14 n. 7. Impressa thus contends that because it is an Italian corporation, and the plaintiffs are a New York limited partnership and a New York domiciliary, this Court has diversity jurisdiction.

■ The Court rejects Impressa's analysis. For purposes of diversity jurisdiction, it is clear that Article III of the Constitution does not afford Congress the power to grant the federal courts jurisdiction over an action between two aliens. *See, e.g., Mossman v. Higginson*, 4 U.S. (4 Dall.) 12, 14, 1 L.Ed. 720 (1800) ("the legislative power of conferring jurisdiction on the federal Courts, is, in this respect, confined to suits between citizens and foreigners"); *Jackson v. Twentyman*, 27 U.S. (2 Pet.) 136, 136, 7 L.Ed. 374 (1829) ("the judicial power was not extended to private suits, in which an alien is a party, unless a citizen be the adverse party"); *Joseph Muller Corp. v. Societe Anonyme de Gerance et D'Armement*, 451 F.2d 727, 729 (2d Cir.1971) ("all parties are aliens, and neither the constitutional nor statutory grants of jurisdiction include such a suit"), *cert. denied*, 406 U.S. 906, 92 S.Ct. 1609, 31 L.Ed.2d 816 (1972).

It is equally clear that, at least since *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806), the federal courts have followed the complete diversity rule that "diversity jurisdiction does not exist unless each defendant is a citizen of a different State from each plaintiff." *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 373, 98 S.Ct. 2396, 2402, 57 L.Ed.2d 274 (1978).

Combining these two rules, the Courts have regularly found that there is no subject

---

**4.** Suits involving aliens (citizens of foreign nations) are more specifically referred to as subject to alienage jurisdiction. For the purposes of this order, the Court will use the terms "diversity jurisdiction" and "alienage jurisdiction" interchangeably.

**5.** The fact that Fashion World Company is a New York limited partnership does not make it a New York citizen for purposes of diversity jurisdiction; the citizenship of all of its general and limited partners must be taken into account. *See Carden v. Arkoma Associates*, 494 U.S. 185, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990). For diversity purposes, a partnership is deemed to take on the citizenship of each of its partners. *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 69 (2d Cir. 1990). Impressa has not supplied any information regarding the citizenship of Fashion World Company's partners. Nevertheless, the Court will treat Fashion World Company as a New York citizen for the purpose of resolving Impressa's objections, because other considerations defeat diversity jurisdiction.

matter jurisdiction over actions brought by an alien against another alien and a citizen of a state. *See, e.g., Ex parte Edelstein,* 30 F.2d 636, 638 (2d Cir.) (Hand, J.) ("concededly an alien may not sue an alien in a federal court"), *cert. denied,* 279 U.S. 851, 49 S.Ct. 347, 73 L.Ed. 994 (1929); *IIT v. Vencap,* 519 F.2d 1001, 1015 (2d Cir.1975) ("Diversity jurisdiction under 28 U.S.C. § 1332 is defeated by the presence of aliens both as plaintiffs and as defendants") (citation omitted); *Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 629 F.2d 786, 790 (2d Cir.1980) ("We have held that the presence of aliens on two sides of a case destroys diversity jurisdiction"), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981); *Fosen v. United Technologies Corp.,* 484 F.Supp. 490, 495 (S.D.N.Y.) ("plaintiffs are Norwegian, the defendant ANA is Japanese; the fact that other defendants in this suit are citizens of a state does not cure this jurisdictional defect") (citation omitted), *aff'd,* 633 F.2d 203 (2d Cir.1980); *Ed and Fred, Inc. v. Puritan Marine Insurance Underwriters Corp.,* 506 F.2d 757, 758 (5th Cir.1975) ("applied to suits brought by aliens, the rule of complete diversity would divest the district court of Section 1332 jurisdiction"); *Eze v. Yellow Cab Co. of Alexandria,* 782 F.2d 1064, 1065 (D.C.Cir. 1986) ("under long-held precedent, diversity must be 'complete.' ... A diversity suit in line with the Strawbridge rule, may not be maintained in federal court by an alien against a citizen of a state and a citizen of some other foreign country").

It follows from the cases referred to above that, without some exceptional grant of jurisdiction, there is no diversity jurisdiction in an action between Impressa, an alien corporation, and Buti, also an alien. The presence of aliens on both sides of the controversy would defeat diversity jurisdiction. However, the last sentence of 28 U.S.C. § 1332(a), added in 1988 by the Judicial Improvements and Access to Justice Act, would afford subject matter jurisdiction if the Act were to be followed literally. The Act added the following language to the diversity statute:

For the purposes of this section ... an alien admitted to the United States for permanent residence shall be deemed a citizen of the State in which such alien is domiciled.

28 U.S.C. § 1332(a). Pursuant to this statute, Buti would be "deemed" a citizen of New York, and "complete" diversity would then exist: Impressa, an alien corporation, would be suing Buti, a New York citizen, and Fashion World Company, a New York citizen.

However, several district courts, including at least two judges in this district, have rejected a literal application of the 1988 amendment in similar circumstances. *See Lloyds Bank PLC v. Norkin,* 817 F.Supp. 414 (S.D.N.Y.1993) (holding that there was no alienage jurisdiction despite language of 1988 amendment); *A.T.X. Export, Ltd. v. Mendler,* 849 F.Supp. 283 (S.D.N.Y.1994) (same); *Arai v. Tachibana,* 778 F.Supp. 1535 (D.Haw.1991) (same); *contra Singh v. Daimler–Benz AG,* 9 F.3d 303 (3d Cir.1993) (holding, contrary to *Lloyds Bank* and *Arai,* that there was diversity jurisdiction in action between resident alien and nonresident alien and its American affiliate). The district court opinions have appropriately recognized that the 1988 amendment was intended to restrict, not expand, diversity jurisdiction. "It was designed to preclude federal jurisdiction in an action in which a resident alien is sued by a citizen of the same state. This provision was not intended to expand the diversity jurisdiction of federal courts in the case of resident aliens." *A.T.X. Export,* 849 F.Supp. at 284.

In a comprehensive treatment of the legislative history of the 1988 amendment and the judicial interpretation of Article III, Judge McKenna rejected a literal reading of the 1988 amendment in *Lloyds Bank,* a case involving a suit by an alien corporation against a citizen of New York and an alien domiciled in New York—circumstances analogous to those here. Judge McKenna noted that the actual language of the diversity statute as amended would require that the alien domiciled in New York be deemed a citizen of New York for purposes of diversity jurisdiction, "thus creating complete diversity by abrogating the established rule that subject matter jurisdiction does not exist where an alien is a plaintiff and an alien is a defendant." *Lloyds Bank,* 817 F.Supp. at 419.

Judge McKenna held that such a result goes beyond the jurisdiction conferred by prior acts of Congress as consistently construed by the courts, and that there is no evidence that Congress in any way intended to abrogate this rule by enacting the 1988 amendment. *Id.* Therefore, he held that, despite the language of the 1988 amendment, there was no basis for alienage jurisdiction. Judge Cedarbaum reached the same result in *A.T.X. Export,* following Judge McKenna's decision in *Lloyds Bank.*

■ This Court agrees with Judge McKenna's thorough discussion of the statutory and constitutional issues in *Lloyds Bank.* There is no evidence that Congress, by enacting the 1988 amendment to the diversity statute, intended to abrogate the long-standing rule that there is no diversity jurisdiction where aliens are parties on both sides of a lawsuit. Because both Buti and Impressa are citizens of a foreign sovereign, this Court does not have diversity jurisdiction over a suit between them. Impressa's objections based on the purported existence of diversity jurisdiction are therefore rejected.

Furthermore, this Court agrees with Magistrate Judge Peck's recommendation that this Court decline to exercise supplemental jurisdiction over Impressa's state law counterclaims for the reasons set forth in the Report and Recommendation. *See* Report and Recommendation at 32–33. Accordingly, the Magistrate Judge's recommendation to dismiss Impressa's state law counterclaims without prejudice is adopted by this Court.

### III. *Recommendation Regarding Sanctions*

■ Impressa also objects to the portion of the Report and Recommendation that recommends the imposition of sanctions on Impressa for submitting the affidavit of attorney David Jaroslawicz in opposition to plaintiffs' summary judgment motion. The Magistrate Judge recommends striking the Jaroslawicz affidavit, except for its submission of exhibits containing discovery materials, and that Buti's request for sanctions be granted "to the limited extent of the reasonable cost of researching and preparing that portion of the motion to strike dealing with defense counsel's affidavit."

The Court adopts the Magistrate Judge's recommendation regarding striking portions of the affidavit but declines to adopt the recommendation regarding sanctions. The Jaroslawicz affidavit does appear to include facts not based on personal knowledge, and thus is technically improper. However, the Court finds that counsel's submission of this affidavit was not so egregious as to justify the imposition of sanctions. Buti sought sanctions under Rule 56(g) of the Federal Rules of Civil Procedure, which permits a court to require a party to pay reasonable attorney's fees incurred by virtue of an affidavit "presented in bad faith or solely for the purpose of delay." In the Court's view, an insufficient showing has been made that the Jaroslawicz affidavit was submitted in bad faith or solely for the purposes of delay. Accordingly, the Court declines to adopt the recommendation regarding sanctions.

### CONCLUSION

For the reasons set forth above, the Court adopts the Magistrate Judge's Report and Recommendation, except for its recommendation regarding the imposition of sanctions. Plaintiffs are granted summary judgment on their claims seeking a declaratory judgment that Impressa does not have rights in the trademark "Fashion Cafe" for restaurant services and clothing in the United States and that Buti did not infringe any such rights. Plaintiffs are also granted summary judgment dismissing Impressa's federal trademark counterclaims with prejudice and its state law claims without prejudice. The parties are to submit proposed judgments to the Court's Judgment Clerk on five days notice.

SO ORDERED.

### REPORT AND RECOMMENDATION

PECK, United States Magistrate Judge.

TO THE HONORABLE ALLEN G. SCHWARTZ, United States District Judge:

Plaintiffs Tommaso Buti and Fashion World Company (collectively "Buti"), owners

of the "Fashion Cafe" in Rockefeller Center in Manhattan, brought this action seeking a declaratory judgment that defendant Impressa Perosa, owner of a "Fashion Cafe" in Milan, Italy, does not have rights in the trademark "Fashion Cafe" for restaurant services and clothing in the United States. Defendant Impressa Perosa asserted counterclaims against Buti for, *inter alia,* misappropriation and false designation of origin in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125.

Presently before the Court is plaintiff Buti's motion for summary judgment on all claims in the complaint and in Impressa Perosa's counterclaims.[1] For the reasons set forth below, I recommend that the Court grant plaintiff Buti's summary judgment motion as to Impressa Perosa's federal trademark counterclaims since Impressa Perosa did not "use" Fashion Cafe in the United States prior to Buti's trademark registration and use. I further recommend that plaintiff Buti be awarded a declaratory judgment that Impressa Perosa does not have any trademark in the name "Fashion Cafe" in the United States, and thus that plaintiff Buti did not infringe on any such rights. Finally, I recommend that the Court dismiss Impressa Perosa's state law counterclaims without prejudice.

### FACTS

While certain facts are hotly disputed, summary judgment is not precluded because the disputed facts are not material to the legal issues necessary to decide the pending motion. Indeed, even assuming the version of the facts most favorable to defendant, Buti still is entitled to summary judgment as a matter of law. As both parties' agree, the "factual crux of this case is whether the defendant used the name 'Fashion Cafe' in commerce, as defined by the trademark statute, 15 U.S.C. § 1127, before the plaintiff began using the name in commerce." (Def's S.J.Br. at 2.)

### *Plaintiff Buti's Miami Beach and New York Fashion Cafes*

In May 1993, plaintiff Tommaso Buti opened a restaurant named the "Fashion Cafe" in Miami Beach, Florida.[2] (Buti 3(g) ¶ 1; Buti Aff. ¶ 2.) Buti maintains that he chose the name to identify with South Beach's flourishing modeling industry and to capitalize on his associations with the fashion industry (he is married to fashion model Daniela Pestova). (Buti S.J.Br. at 2; Buti 3(g) ¶¶ 2–3; Buti Aff. ¶ 4; Buti Dep. at 68–69.)

Buti maintains that when he opened his Miami "Fashion Cafe," he had never heard of or patronized the defendant's Milan "Fashion Cafe." (Buti 3(g) ¶ 4; Buti Aff. ¶ 3.)

In June–July 1994, "Buti commenced plans to open a franchise of theme restaurants, similar to Hard Rock Cafe or Planet Hollywood, but focusing on the fashion model industry instead of rock and roll or film." (Buti 3(g) ¶ 7; Buti Aff. ¶¶ 5, 8, 9.) Buti hired the law firm of Stroock Stroock & Lavan ("Stroock") to perform a trademark search of the "Fashion Cafe" name. (Buti

1. Plaintiff Buti originally moved to dismiss defendant's counterclaims for failure to state a claim. After the close of discovery, Buti submitted additional papers and requested that the motion be converted into a summary judgment motion. Although defendant Impressa Perosa objects to this conversion (*see* Def's S.J.Br. at 2), it filed responsive papers to the summary judgment motion, attaching voluminous deposition transcripts and affidavits. Thus, defendant is not prejudiced by treating the motion as a summary judgment motion. While defendant Impressa Perosa did not cross-move for summary judgment, in its brief opposing plaintiff's summary judgment motion, Impressa Perosa asks the Court to "search the record," grant defendant summary judgment on the counterclaims, and schedule a damages trial after a short damages discovery period. (*See* Def's S.J.Br. at 13–14.) For the reasons set forth below, I recommend that defendant's "request" for summary judgment be denied.

2. Buti changed that restaurant's name to "Fashion on the Beach" and later to "Mezzaluna," allegedly to avoid confusion with the "Fashion Cafe" chain that he opened in New York. (Buti Dep. at 22–25, 30–32.) Mr. Santambrogio, the principal owner/officer of defendant Impressa Perosa, alleges that Buti changed the name of the Miami Beach "Fashion Cafe" at Santambrogio's request. (Santambrogio Aff. at p. 4–5.) Buti denies ever discussing the Miami restaurant with Mr. Santambrogio. (Buti Dep. at 22.)

3(g) ¶ 8; Buti Aff. ¶¶ 5–6; Affidavit of Steven Pokotilow, a Strook partner, ¶ 3.) After Stroock reported that there was no use or registration of the "Fashion Cafe" mark in the United States, Buti filed an application with the U.S. Patent and Trademark Office for registration of the mark "Fashion Cafe." (Buti 3(g) ¶¶ 9–10; Pokotilow Aff. ¶¶ 4–5; Buti Aff. ¶ 6.)

In early December 1994, Buti publicized the groundbreaking for the New York Fashion Cafe, including promotion by "supermodels" Claudia Shiffer, Elle Macpherson, Naomi Campbell and Christy Turlington. (Buti 3(g) ¶ 11; Buti Aff. ¶¶ 11, 13.) [3] This generated thousands of television, newspaper and magazine articles worldwide. (Buti 3(g) ¶ 12; Buti Aff. ¶ 13; Buti S.J.Mtn.Ex. E: Affidavit of Celia A. Maiset, ¶¶ 4–5 & attachments thereto.)

Plaintiff Buti's Fashion Cafe restaurant opened in New York on April 7, 1995. (Buti 3(g) ¶ 13; Buti Aff. ¶ 8; see Defs' 3(g) ¶¶ 11–12.) The New York Fashion Cafe features a "fashion model motif" with fashion photographs displayed, fashion shows on large-screen televisions, and a large camera lens as the restaurant's entrance. (Buti 3(g) ¶ 13; Buti Aff. ¶ 9; see Defs' 3(g) ¶¶ 11–12.) "A key feature of [plaintiff's] Fashion Cafe restaurants is the marketing of an extensive line of apparel and souvenirs bearing the Fashion Cafe logo. The restaurants also serve high quality American cuisine in an elegant setting." (Buti Aff. ¶ 10.) Buti invested over ten million dollars to open and operate the New York Fashion Cafe, which in its first year of operation had sales exceeding ten million dollars. (Buti 3(g) ¶¶ 15, 16; Francesco Buti Aff. ¶¶ 4, 6.) Buti has opened another Fashion Cafe in New Orleans, and several others are under construction. (Buti 3(g) ¶ 18; Francesco Buti Aff. ¶ 7.)

### Defendant Santambrogio's Milan Fashion Cafe

Giorgio Santambrogio is an officer and 33% owner of defendant Impressa Perosa, an Italian company.[4] (Santambrogio Aff. at p. 1; Santambrogio Dep. at 111.) Santambrogio has ownership interests in several businesses including the Fashion Model Management modeling agency located in Milan, Italy, and two restaurants/cafes in Milan known as the Fashion Cafe and the Grand Fashion Cafe. (Santambrogio Aff. at p. 2.) The Fashion Cafe is a "bar with a cafeteria," not a restaurant, which opened in Milan in 1987; the Grand Fashion Cafe is a restaurant which opened in Milan for one night in October 1994 and then formally opened on February 17, 1995. (Santambrogio Aff. at p. 2; Santambrogio Dep. at 101, 122, 172, 185–89, 231; Defs' 3(g) ¶ 15; Buti 3(g) ¶ 19, 28.) This litigation centers on the Milan "Fashion Cafe" bar-cafeteria, not the 1995 Milan Grand Fashion Cafe restaurant. (See Santambrogio Dep. at 228.)

Impressa Perosa registered the Fashion Cafe trademark in Italy in April 1988. (Santambrogio Aff. at 9; Santambrogio Aff.Ex. C; Santambrogio Dep. at 55, 61; Buti 3(g) ¶ 21.) Santambrogio maintains that he purchased the name "Fashion Cafe" from Impressa Perosa two to four years ago so that he could develop the business "all over the world." (Santambrogio Dep. at 39–40.) [5]

---

**3.** Defendant Impressa Perosa also asserted counterclaims against Macpherson, Campbell and Turlington. (See Impressa Perosa's "Amended Answer and Counterclaims" [hereafter, "Counterclaims"] ¶¶ 23–26.) After discovery, defendant dismissed the counterclaims against the three supermodels.

**4.** The Court will use the names "Santambrogio" and "Impressa Perosa" interchangeably in this Report and Recommendation.

**5.** However, in his affidavit, Santambrogio asserts that Impressa Perosa is the legal owner of the name and trademark, and that Impressa Perosa merely authorized Santambrogio to use the name in his individual capacity. (Santambrogio Aff. at p. 1.) Santambrogio also testified at his deposition that Impressa Perosa sold the Milan Fashion Cafe to a company named "GR1" (of which Santambrogio is a 30% partner). (Santambrogio Dep. at 110–11.) GR1, in turn, leased the name "Fashion Cafe" to a "leasing company" named Agape for 300 million lire. (Id.; Buti 3(g) ¶ 23; Def's 3(g) ¶ 17.) Buti seeks summary judgment on the counterclaims on the additional ground that Impressa Perosa is not the proper party. (Buti S.J.Br. at 21–22; Buti S.J.Reply Br. at 13–14.) Because of my recommendation on the merits, I need not reach Buti's improper party argument.

Santambrogio never opened a restaurant in the United States, nor did he ever sell any food or other merchandise in the U.S. (Santambrogio Dep. at 107; Santambrogio Aff. at p. 8; Def's S.J.Br. at 6.) Santambrogio never hired a public relations firm or advertising agency in the United States to promote the Fashion Cafe, and no newspaper articles were ever written about his Fashion Cafe. (Santambrogio Dep. at 222; *see* Buti S.J.Mtn.Ex. I: Affidavit of Miguel de la O, ¶¶ 3–5.)

When Santambrogio visited the U.S., he promoted his Milan Fashion Cafe by giving to models free T-shirts, small gift items with the Milan Fashion Cafe name, business cards and "vouchers" for free food and beverages. (Santambrogio Dep. at 220–21; Santambrogio Aff. at p. 3.) Santambrogio maintains that he distributed "literally thousands of T-shirts, cards, and key chains with the [Milan] Fashion Cafe name and logo to persons associated with the modeling and fashion industry which entitled them to free meals at the Fashion Cafe(s) in Milan . . ." (Santambrogio Aff. at p. 9; *see also* Affidavit of Faith Kates, at p. 2.)

Santambrogio had a "fantasy" "in his brain" that he would approach American hotel chains such as Hilton or Sheraton and try to expand his Milan restaurant into a United States chain, but he admits that he never approached any of the hotel chains about his idea. (Santambrogio Dep. at 161–62, 319–20.) [6]

When Impressa Perosa heard of Buti's plans to open the New York Fashion Cafe, Impressa Perosa attempted to register the name Fashion Cafe in the United States in December 1994, after Buti had registered his name with the Patent and Trademark Office. (Buti 3(g) ¶ 29; Santambrogio Dep. at 64, 250; Santambrogio Aff. at p. 6.)

### Buti's Knowledge of the Milan Cafe

Buti claims that when he "opened the Fashion Cafe restaurant in Miami Beach [in 1993], [he] had never visited the Fashion Cafe in Milan, nor was [he] aware of its existence." (Buti Aff. ¶ 3; Buti 3(g) ¶ 4.) Buti further testified that he had never discussed his Miami restaurant with Santambrogio. (Buti Dep. at 22.)

Santambrogio responds that "Mr. Buti's statement that he never visited the Fashion Cafe in Milan, Italy is simply false because I, and hundreds of other persons, personally witnessed his presence there on more than one occasion." (Santambrogio Aff. at p. 3; *see also id.* at p. 2, 4, 9.) This testimony, however, is directly contradicted by Santambrogio's deposition testimony in which he admits that he never saw Buti (or Buti's wife) in the Milan Fashion Cafe. (Santambrogio Dep. at 147–48.)

According to Santambrogio: He and Buti met in late 1993 at the Milan Fashion Cafe and Buti "proudly displayed to me a postcard showing a restaurant cafe he had opened in Miami Beach, Florida, also named the Fashion Cafe." (Santambrogio Aff. at p. 4.) San-

---

**6.** The deposition testimony in question reads as follows:

Q: You never spoke to Hilton or Sheraton or Marriott though?

A: This was in my brain. This was in my brain like I tell you now. Unfortunately, no.

Q: Was it on paper anywhere?

A: No. In the brain is more than the paper because it's more fantasy. You cannot write down what you think in one second. It takes one year.

Q: So these ideas about using the name in the United States were in your brain?

A: Sure.

(Santambrogio Dep. at 161–62.)

Q: What other . . . points within the United States were you planning to open a Fashion Cafe?

A: I don't know. Everywhere. Everywhere. Because as I told you yesterday, I have a lot

of fantasy and the fantasy is basically what makes a business or new idea going. Even if can be ridiculous, my fantasy was to get in touch with the biggest hotel group in America like Sheraton or the biggest mall in America or Hilton group, they own hotels everywhere, Las Vegas, New Orleans, Los Angeles, everywhere they have hotels.

So in every hotel to open a nice—a nice, because they have a license, they don't need anything and they can be very fast because they have buying capitals to open a nice Fashion Cafe. Fashion Cafe in Hilton Hotel. Fashion Cafe in Sheraton Hotel. It would be fantastic.

Q: That was your fantasy?

A: It was a fantasy that could be done. Everything has to be, to start with a fantasy. . . .

(*Id.* at 319–20.)

tambrogio advised Buti that "he had no rights to use the name Fashion Cafe because that name had been trademarked by [Santambrogio] ... and that [Santambrogio] intended to file a trademark for the name in the United States...." (*Id.*) Buti apologized and "stated he would stop using the name of Fashion Cafe in the United States." (*Id.* at p. 4–5.) Buti later advised Santambrogio that he had changed the name of the Miami restaurant to "Fashion on the Beach," which he hoped would satisfy Santambrogio. (*Id.* at p. 5.) After Santambrogio advised Buti that he would prefer that the restaurant not have the word "fashion" in the title, Buti again changed the restaurant name. (*Id.*)

*Santambrogio's Threat of Litigation and This Lawsuit*

On January 19, 1995—one month after the groundbreaking for the New York Fashion Cafe and its attendant worldwide publicity—counsel for Impressa Perosa wrote to Buti demanding that Buti "cease and desist" from using the "Fashion Cafe" name, and threatened litigation if Buti did not comply. (Santambrogio Aff. at p. 6 & Ex. A; Buti 3(g) ¶ 30.) Buti filed this declaratory judgment action in response. (Buti 3(g) ¶ 31; Buti Aff. ¶ 14.)

Plaintiff Buti's complaint seeks, *inter alia,* a declaratory judgment that "Defendant does not have rights in the trademark 'Fashion Cafe' for restaurant services or clothing in the United States" and that "Plaintiffs do not infringe trademark rights of Defendant, if such rights exist, ..." (Cplt., "Wherefore" ¶¶ A–B.)

Defendant Impressa Perosa asserts six counterclaims. The first counterclaim, for misappropriation and false designation of origin, alleges that Buti deliberately and willfully violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125, by infringing on defendant's rights in the name "Fashion Cafe." (Counterclaims ¶¶ 23–51.) Defendant's second counterclaim alleges that Buti's trademark application contained false and fraudulent declarations (*i.e.,* that no one else was using that mark), which damaged defendant. (Counterclaims ¶¶ 52–58.) The third counterclaim alleges that Buti misappropriated defendant's concepts and the name "Fashion

Cafe." (Counterclaims ¶¶ 59–65.) The fourth counterclaim alleges that Buti engaged in unfair and deceptive business practices in violation of N.Y. General Business Law § 349 et seq. (Counterclaims ¶¶ 66–73.) The fifth counterclaim alleges unfair competition. (Counterclaims ¶¶ 74–78.) Finally, the sixth counterclaim seeks injunctive relief for violation of the Lanham Act, 15 U.S.C. § 1115, and N.Y. General Business Law § 349. (Counterclaims ¶¶ 79–84.)

## ANALYSIS

**I. BUTI'S SUMMARY JUDGMENT MOTION SHOULD BE GRANTED ON THE FEDERAL TRADEMARK LAW CLAIMS AND COUNTERCLAIMS BECAUSE IMPRESSA PEROSA DID NOT USE THE "FASHION CAFE" MARK IN THE UNITED STATES**

**A. Buti Should Be Granted Summary Judgment on Buti's Federal Trademark Claim and Defendant's First Counterclaim (Under 15 U.S.C. § 1125)**

The central issue on plaintiff's declaratory judgment claim, and on defendant's first counterclaim for misappropriation and false designation of origin pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), is whether plaintiff or defendant has superior rights to the name "Fashion Cafe" in the United States.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1), provides:

> Any person who, on or in connection with any goods or services, ... uses in commerce any word, term, name, symbol, or device ... or any false designation of origin ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

"[O]wnership of trademark or trade dress rights in the United States is obtained by actual use of a symbol to identify the goods or services of one seller.... The way to obtain rights in a business symbol is to actually *use* it as a mark." 2 J. McCarthy, *McCarthy on Trademarks & Unfair Competition* [hereafter "McCarthy"] § 16.01[1] (3d ed. 1996) (emphasis in original). "Use" means " 'the bona fide use of a mark in the

ordinary course of trade, and not merely to reserve a right in a mark.'" 2 McCarthy § 16.02[2], quoting 15 U.S.C. § 1127. "Unlike patent law, rights in trademarks are not gained through discovery or invention of the mark, but only through actual usage. Trademark priority is not automatically granted to the person who was first to conceive of the idea of using a given symbol as a mark.... To acquire ownership of a trademark, one must actually use the mark in the sale of goods or services." *Id.* § 16.03.

When two or more companies adopt the same mark, basic rules of trademark priority determine use and ownership of the mark. *E.g., McKay v. Mad Murphy's, Inc.,* 899 F.Supp. 872, 881 (D.Conn.1995) (citing McCarthy). The Second Circuit has outlined the criteria to determine priority in a mark:

> Under familiar trademark principles, the right to exclusive use of a trademark derives from its appropriation and subsequent use in the marketplace. The user who first appropriates the mark obtains an enforceable right to exclude others from using it, as long as the initial appropriation and use are accompanied by an intention to continue exploiting the mark commercially.... Adoption and a single use of the mark may be sufficient to entitle the user to register the mark.... To prove bona fide usage, the proponent of the trademark must demonstrate that his use of the mark has been deliberate and continuous, not sporadic, casual or transitory.

*La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.,* 495 F.2d 1265, 1271–72 (2d Cir.1974).

Determination of priority here depends on the meaning of the "use" of a mark "in commerce." The Lanham Act provides in 15 U.S.C. § 1127 that:

> [A] mark shall be deemed to be in use in commerce—
>
> (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services

is engaged in commerce in connection with the services.

Indeed, Impressa Perosa "has no quarrel with the plaintiffs ... that an allegation of actual use of a trademark, service mark or trade name in commerce is necessary to assert a claim pursuant to § 43(a) of the Lanham Act, 15 U.S.C. § 1125, or that the required sort of commerce is commerce within the United States or commerce between the United States and a foreign country." (Def's Br. in Opposition to Plaintiffs' Motion to Dismiss, at 11 & n. 9, citing *Person's Co. v. Christman,* 900 F.2d 1565, 1568 (Fed.Cir. 1990); *see also* Def's S.J.Br. at 2, 6, 8.)

### 1. *Impressa Perosa's 1988 Italian Trademark Registration and Use of the Mark in Italy Do Not Give It Rights to the Mark in the United States*

As explained in McCarthy's trademark treatise:

> Under the territoriality doctrine, a trademark is recognized as having a separate existence in each sovereign territory in which it is registered or legally recognized as a mark....
>
> Priority of trademark rights in the United States depends solely upon priority of use in the United States, not on priority of use anywhere in the world. Prior use in a foreign nation does not establish priority of use in America.

4 McCarthy §§ 29.01[1], 29.01[2]; *see also, e.g.,* 2 McCarthy § 16.07; 3 McCarthy § 26.02; *Person's v. Christman,* 900 F.2d at 1568–69 ("foreign use has no effect on U.S. commerce and cannot form the basis for a holding that appellant has priority here. The concept of territoriality is basic to trademark law; trademark rights exist in each country solely according to that country's statutory scheme."); *La Societe Anonyme v. Jean Patou,* 495 F.2d at 1270 n. 4 ("It is well settled that foreign use is ineffectual to create trademark rights in the United States."); *Financial Matters, Inc. v. PepsiCo, Inc.,* 806 F.Supp. 480, 485 (S.D.N.Y.1992); *Scholastic, Inc. v. Macmillan, Inc.,* 650 F.Supp. 866, 873 n. 6 (S.D.N.Y.1987).

It is clear that, without more, Impressa Perosa does not derive any right to the "Fashion Cafe" mark in the United States from either its trademark registration of "Fashion Cafe" in Italy in 1988 or from its operation since 1987 of the Milan Fashion Cafe.

### 2. Impressa Perosa's Efforts to Advertise the Milan "Fashion Cafe" in the United States and to Negotiate to Establish a United States Restaurant Do Not Constitute "Use" of the Mark in the United States

Impressa Perosa asserts that it established its senior right to use the name "Fashion Cafe" in the United States through its promotional efforts of the Milan Fashion Cafe, including distribution in the United States of promotional materials (T-shirts, key chains, business cards and vouchers to models for free meals at the Milan Fashion Cafe), "formulating a plan to put a Fashion Cafe establishment in hotels in major cities," and "actively negotiating with restauranteurs ... which negotiation is itself use of the name Fashion Cafe in New York." (Def's S.J.Br. at 5.)

### a. "Mere Advertising" Unconnected to an Established Business Is Not "Use"

Impressa Perosa "advertised" on behalf of the Milan Fashion Cafe by handing out free promotional materials in the United States to those involved in the fashion industry. However, advertising alone that is not connected to an established United States business does not constitute "use" under the Lanham Act. *See, e.g., Pirone v. MacMillan, Inc.,* 894 F.2d 579, 583 (2d Cir.1990) ("The purpose of a trademark is to designate the source of a product and it has no existence apart from the trade 'in connection with which the mark is employed.' ") (quoting *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 97, 39 S.Ct. 48, 50, 63 L.Ed. 141 (1918)); *Cullman*

*Ventures, Inc. v. Columbian Art Works, Inc.,* 717 F.Supp. 96, 112 (S.D.N.Y.1989) ("Mere advertisement of a product by use of a mark would not constitute common law trademark use. Common law trademark rights develop when goods bearing the mark are placed in the market and followed by continuous commercial utilization."); *Sunbeam Corp. v. Merit Enterprises, Inc.,* 451 F.Supp. 571, 574 (S.D.N.Y.1978) (" 'the mere advertisement of a product does not constitute trademark use.' ") (quoting *Modular Cinemas of America, Inc. v. Mini Cinemas Corp.,* 348 F.Supp. 578, 582 (S.D.N.Y.1972) ("service mark use ... is still predicated upon the existence of an established operating business. For only then does a mark function to identify the source of one's trade in the marketplace.")).[7]

Thus, Santambrogio's United States advertising efforts (via T-shirt, business card and other give-aways to those in the fashion industry) do not suffice in the absence of an operating business using the trademark "Fashion Cafe." It is undisputed that Santambrogio had no such operating business in the United States. (Santambrogio Dep. at 107; Santambrogio Aff. at p. 8.) The issue, therefore, is whether Santambrogio's advertisement in the United States of his Milan Fashion Cafe constitutes sufficient "use" to give Santambrogio United States trademark rights.

### b. United States Advertising of A Foreign Business Is Not "Use" in the United States

While the courts do not appear to have addressed the issue of whether U.S. advertising of a foreign business establishes United States trademark rights, the Patent and Trademark Office's Trademark Trial and Appeal Board has, adversely to Impressa Perosa. The Court notes that neither party cited to these directly on point decisions.

In *Mother's Restaurants Inc. v. Mother's Other Kitchen, Inc.,* 218 U.S.P.Q. 1046

---

7. *See also, e.g., Koffler Stores Ltd. v. Shoppers Drug Mart, Inc.,* 434 F.Supp. 697, 701 (E.D.Mich.1976) ("[m]ere advertising use is insufficient to support a valid trademark."), *aff'd,* 559 F.2d 1219 (6th Cir.1977); *Victor Tool & Machine Corp. v. Sun Control Awnings, Inc.,* 299 F.Supp. 868, 874 (E.D.Mich.1968) ("Plain-

tiff's advertising use, even if established, cannot give plaintiff any trademark rights, since a trademark must be used on or in direct connection with the goods, and a mere advertising use is insufficient to support a valid trademark."), *aff'd,* 411 F.2d 792 (6th Cir.1969).

(TTAB1983), a Canadian pizza restaurant that used the name "Mother's Pizza Parlor" opposed trademark registration of the name "Mother's Other Kitchen" for an American carry out restaurant on the grounds that the mark resembled the Canadian restaurant's mark. 218 U.S.P.Q. at 1047. The Canadian corporation asserted that it had made prior use of its mark in the United States through: radio advertisements on Canadian stations whose signals reached the U.S.; the distribution of promotional materials at tourist information booths in Canada directed at U.S. citizens; serving Americans dining at the Canadian restaurants; and fielding inquiries from Americans as to franchise opportunities in the U.S. *Id.* at 1047–48.

The Trademark Trial and Appeal Board held that the Canadian corporation's advertising efforts were not a sufficient use of the mark in the U.S., stating:

[I]t is our view that prior use and advertising of a mark in connection with goods or services marketed in a foreign country (*whether said advertising occurs inside or outside the United States*) creates no priority rights in said mark in the United States as against one who, in good faith, has adopted the same or similar mark for the same or similar goods or services in the United States prior to the foreigner's first use of the mark on goods or services sold and/or offered in the United States ..., at least unless it can be shown that the foreign party's mark was, at the time of the adoption and first use of a similar mark by the first user in the United States, a "famous" mark within the mean-

ing of *Vaudable v. Montmartre, Inc.*, 20 Misc.2d 757, 193 N.Y.S.2d 332, 123 U.S.P.Q. 357 (N.Y.Sup.Ct.1959).

218 U.S.P.Q. at 1048 (emphasis added).[8]

Likewise, in *Linville v. Rivard*, 26 U.S.P.Q.2d 1508 (TTAB), *vacated and remanded on other grounds*, 11 F.3d 1074 (Fed.Cir.1993), an American beauty salon using the name "Ultracuts" filed a petition to cancel a Canadian corporation's U.S. trademark registration with the same name on the grounds that the Canadian corporation had never made use of the name in the United States. 26 U.S.P.Q.2d at 1509. The Canadian corporation argued that it had made use of the mark through: meetings in the U.S. with possible franchisees; review of possible sites for stores in the United States; advertisements on Canadian radio stations that also are heard in the U.S.; advertisements in Canadian newspapers read in the U.S.; servicing U.S. citizens who had travelled over the border to his Canadian stores, resulting in $25,000 of annual revenue; and "promotional give-aways and coupons" at a fair in the United States. *Id.* at 1510–11. The Trademark Trial and Appeal Board rejected the Canadian corporation's argument that advertising was use of the mark in the United States. *Id.* at 1512. The Board also held that no United States trademark rights were acquired by United States residents using the Canadian company's services while in Canada, because of the concept of territoriality. *Id.* The Board concluded by quoting the passage from *Mother's* that is quoted above. 26 U.S.P.Q.2d at 1512–13.[9]

8. In a separate opinion, one member of the Board stated:

[T]he only impact of the spillover advertising is on commerce within Canada. The rendering of the services is in Canada, by Canadian persons and entities. The profit, if any, emanating from the rendering of such services accrues to Canadian citizens. To avail oneself of the services one must be in Canada. Thus, there is no impact as a result of the spillover advertising on commerce between Canada and the United States. Accordingly, the prior spillover advertising of "MOTHER'S" and "MOTHER'S PIZZA PARLOUR & SPAGHETTI HOUSE" created no rights or priority for opposer in the United States. 218 U.S.P.Q. at 1051 (Allen, concurring in part). Here too, Santambrogio's advertising in

the United States only had an impact on commerce in Milan, Italy; the restaurant services were rendered in Milan, any profit flowed to Milan, and to avail oneself of the restaurant services one must be in Milan. Thus, there is no impact on United States commerce and no use or rights to the mark in the United States.

9. *Linville* is cited in McCarthy's trademark treatise: "The Trademark Board has held that neither advertisements in the United States for Canadian beauty salon services, nor U.S. citizens travelling to Canada to use the services, constitute 'use' in the United States sufficient to form a basis for U.S. registration of the service mark." 4 McCarthy § 29.01[4] & n. 23.1. *See also, e.g., Techex Ltd. v. Dvorkovitz,* 220 U.S.P.Q. 81, 83 (TTAB1983) ("It is our

Although the Court recognizes that the decisions of the TTAB are not binding on this Court, "they are nevertheless entitled to 'great weight.'" *E.g., GMT Productions, L.P. v. Cablevision of New York City, Inc.,* 816 F.Supp. 207, 212 (S.D.N.Y.1993).

The *Mother's* and *Linville* decisions by the Trademark Trial and Appeal Board are directly applicable to this "Fashion Cafe" case.[10] If anything, those cases involved even stronger facts for the foreign corporations than the case at bar since in both cases the Canadian corporations placed radio and newspaper advertisements that reached American customers. By contrast, Impressa Perosa's distribution of T-shirts, business cards and other give-aways appears to be a much weaker advertising effort; its purpose was not to attract paying United States customers but to attract models with free food, so their presence would attract people in Milan to attend the Milan Fashion Cafe. Moreover, given the geographic proximity between Canada and the United States, a stronger case could be made that "goodwill" in the mark was established through the American customers who patronized the Canadian shops. Defendant Santambrogio has not alleged that the Milan Fashion Cafe attracted any paying customers from the United States (as opposed to United States fashion models to whom he offered free services). Even if he had, however, these two cases clearly hold that neither advertising efforts nor American patronage in foreign businesses suffice to establish use of the mark in the United States.

### c. Buti Is Not Guilty of "Bad Faith" So As to Constitute An Exception to the Mother's Rule

In *Mother's Restaurant v. Mother's Other Kitchen,* discussed above, the Trademark Trial and Appeal Board implicitly stated that a party attempting to establish priority

rights to a mark in the U.S. must meet a "good faith" requirement as against a prior foreign user. *See* 218 U.S.P.Q. at 1048 ("[I]t is our view that prior use and advertising of a mark in connection with goods or services marketed in a foreign country ... creates no priority rights in said mark in the United States as against one whom, *in good faith,* has adopted the same or similar mark ...") (emphasis added).

Impressa Perosa argues that Buti can not establish good faith since Buti had knowledge of the existence of the Milan Fashion Cafe prior to his establishment of the Miami Beach or New York Fashion Cafes.

First, Santambrogio has not presented any *admissible* evidence that Buti was in or knew of the Milan Fashion Cafe. Buti submitted an affidavit that he never visited or was aware of the Milan Fashion Cafe before he opened his Fashion Cafe in Miami Beach in 1993. (Buti Aff. ¶ 3; Buti 3(g) ¶ 4; *see also* Buti Dep. at 22.) Santambrogio submitted an affidavit that he "personally witnessed [Buti's] presence [at the Milan Fashion Cafe] on more than one occasion." (Santambrogio Aff. at p. 3; *see also id.* at p. 2, 4, 9.) That testimony, however, is directly contradicted by Santambrogio's deposition testimony in which he admits that he never saw Buti in the Milan Fashion Cafe. (Santambrogio Dep. at 147–48.)

The Second Circuit has ruled that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts that affiant's previous deposition testimony." *Hayes v. New York City Department of Corrections,* 84 F.3d 614, 619 (2d Cir.1996) (citing cases). "'If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of

---

view that prior use and advertising of a trade name in connection with a business in a foreign country creates no property right in said name in the United States as against one who, in good faith, adopted the same or similar work for the same or similar goods or services in the United States," except for a name that is "famous" in the United States, citing *Mothers.*).

10. Those TTAB cases also cause the Court to reject Impressa Perosa's argument that its negotiation for future Fashion Cafe restaurants at various U.S. hotels or with United States restauranteurs before the opening of Buti's New York Fashion Cafe constitutes use of the mark in the United States. (*See also* cases cited in Section I(A)(2)(a), above.)

summary judgment as a procedure for screening out sham issues of fact.' " *Id.* (quoting *Perma Research & Dev. Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir.1969)). Therefore, under *Hayes,* the Court cannot, and does not, accept Santambrogio's affidavit testimony that he saw Buti in the Milan Fashion Cafe. Without that testimony, there is no evidence that Buti was aware of defendant's Milan Fashion Cafe before he opened a United States Fashion Cafe.

Second, the Court finds that, even if Santambrogio's claims of Buti's prior knowledge of the use of the Fashion Cafe mark in Italy are accepted, that does not establish bad faith on Buti's part. In *Person's Co. v. Christman,* 900 F.2d 1565 (Fed.Cir.1990), the Court considered the good faith issue on similar facts. In *Person's,* Larry Christman, an employee of a U.S. sportswear wholesaler, visited Japan in 1981 and purchased several clothing items bearing that mark "Person's" from a Japanese sportswear line by the same name. *Id.* at 1567. Upon returning to the United States, and discovering through counsel that no one had yet established a claim to the logo in the U.S., Christman began to market a sportswear line in the United States bearing the "Person's" logo. *Id.* Christman filed an application for the U.S. trademark registration in 1983, and the registration issued in 1984. *Id.*

The Japanese Person's began a plan to sell goods under the "Person's" mark in the U.S. Purchases of the Japanese "Person's" line in the U.S. occurred as early as November 1982, seven months after Christman's first use in the U.S. *Id.*

In early 1986, the Japanese corporation learned of Christman's advertising and filed an action to cancel Christman's registration. *Id.* The TTAB issued a "well reasoned" decision (in the opinion of the Federal Circuit) for Christman on the grounds that Person's use of the mark in Japan could not be used to establish priority against a "good faith" senior user. *Id.* The Federal Circuit upheld the reasoning and holding of the TTAB. The Court held that Christman's use of the mark was not in bad faith because:

> The concept of bad faith adoption applies to remote junior users seeking concurrent

use registrations; in such cases, the likelihood of customer confusion in the remote area may be presumed from proof of the junior user's knowledge. In the present case, when Christman initiated use of the mark, Person's Co. had not yet entered U.S. commerce. The Person's Co. had no goodwill in the United States and the "PERSON'S" mark had no reputation here. Appellant's argument ignores the territorial nature of trademark rights.

> Appellant next asserts that Christman's knowledge of its prior use of the mark in Japan should preclude his acquisition of superior trademark rights in the United States. The Board found that, at the time of registration, Christman was not aware of appellant's intention to enter the U.S. clothing and accessories market in the future. Christman obtained a trademark search on the "PERSON'S" mark and an opinion of competent counsel that the mark was "available" in the United States. Since Appellant had taken no steps to secure registration of the mark in the United States, Christman was aware of no basis for Person's Co. to assert superior rights to use and registration here. Appellant would have us infer bad faith adoption because of Christman's awareness of its use of the mark in Japan, but *an inference of bad faith requires something more than mere knowledge of prior use of a similar mark in a foreign country* . . . .

> *Knowledge of a foreign use does not preclude good faith adoption and use in the United States.* While there is some case law supporting a finding of bad faith where (1) the foreign mark is famous here [citing *Vaudable* and *Mother's* ] or (2) the use is a nominal one made solely to block the prior foreign user's planned expansion into the United States, as the Board correctly found, neither of these circumstances is present in this case.

We agree with the Board's conclusion that Christman's adoption and use of the mark were in good faith. Christman's adoption of the mark occurred at a time when appellant had not yet entered U.S. commerce; therefore, no prior user was in place to give Christman notice of appel-

lant's potential U.S. rights. Christman's conduct in appropriating and using appellant's mark in a market where he believed the Japanese manufacturer did not compete can hardly be considered unscrupulous commercial conduct.

900 F.2d at 1569–70 (emphasis added & fns. omitted).

Person's reasoning is directly applicable to this case. Here, as in *Person's*, Impressa Perosa had not used its mark in the U.S. when Buti initiated use of "Fashion Cafe" in the U.S. Santambrogio conceded at his deposition that, before the December 1994 groundbreaking for Buti's Fashion Cafe, Buti had no way to know of Santambrogio's plan to open a United States Fashion Cafe. (Santambrogio Dep. at 318–19.) Thus, Impressa Perosa has not established Buti's bad faith merely by asserting Buti's knowledge of Impressa Perosa's prior use of the Fashion Cafe name in Italy.

**d. The Milan "Fashion Cafe" is Not A "Famous" Mark So As to Come Within the Vaudable Exception to the Mother's Rule**

Finally, Impressa Perosa has not argued that the "Fashion Cafe" mark was "famous" as defined by *Vaudable v. Montmartre,* 20 Misc.2d 757, 193 N.Y.S.2d 332 (Sup.Ct. N.Y.Co.1959), so as to bring it within the exception described in *Mother's* and *Person's. See also* 4 McCarthy § 29.01[4].

In *Vaudable v. Montmartre,* the plaintiff, owner and operator of "Maxim's" restaurant in Paris, moved for a permanent injunction restraining the defendants, the owner and operator of a newly opened New York "Max-

im's," from using the name. 20 Misc.2d at 758, 193 N.Y.S.2d at 334. The Court noted that the French restaurant "Maxim's" was established in 1893 and had received wide publicity in the United States over a long period of years through newspaper and magazine articles, and as a prominently featured location in movies, television and in opera. *Id.* Indeed, the Maxim's plaintiff had "registered the Mark Maxim's with the United States Patent Office for catering services and wines and have merchandised and sold food products under the name or a variant thereof, in the United States." *Id.* The Court found that Maxim's was "well known in this country" and particularly in New York. *Id.* Given this level of recognition in the U.S., the Court found that plaintiff's Paris "Maxim's" had secondary meaning in the United States, that defendant's use of it constituted unfair competition, and the Court therefore enjoined defendant from use of the name "Maxim's." 20 Misc.2d at 759–60, 193 N.Y.S.2d at 335–36.

The Court finds that there is no evidence in the record that Santambrogio's Milan Fashion Cafe ever achieved any level of recognition approaching that of Maxim's so as to be a "famous" foreign mark in the United States. Santambrogio admitted that he never bought advertising in the U.S., never hired a public relations firm, and that no newspaper articles had ever been published in the U.S. referring to the Milan Fashion Cafe. (Santambrogio Dep. at 222, 232–33.) [11] Santambrogio has failed to offer admissible evidence of any "secondary meaning" of its Fashion Cafe in the United States.[12] Ac-

---

**11.** Santambrogio alleged that now "the name Fashion Cafe is very well known," but admitted that he "[could] not tell you if it's because of me or because of Mr. Buti" and admitted that he had never conducted a survey to test the level of United States recognition of the Milan Fashion Cafe. (Santambrogio Dep. at 293–94.) The evidence in the record appears to indicate that the reason that the Fashion Cafe mark was "very well known" was because the owners of the New York Fashion Cafe had spent millions of dollars in advertising and promotion and that the "supermodels" generated over 750,000 newspaper articles and 175,000 television reports worldwide. (Buti S.J.Mtn.Ex. E.) In any event, there is no evi-

dence that the Milan Fashion Cafe mark is well known in the United States.

**12.** Santambrogio has offered the signatures of some 100 people on a form that says they thought Santambrogio was involved in plaintiff Buti's New York Fashion Cafe because "he owns already the well-known Fashion Cafe in Milan." (Santambrogio Aff.Ex. B.) First, Exhibit B is classic hearsay and, as such, inadmissible on this summary judgment motion. *Cf. Ortho Pharmaceutical Corp. v. Cosprophar, Inc.* 828 F.Supp. 1114, 1122 (S.D.N.Y.1993) (holding survey to be inadmissible as hearsay where no foundation laid that it was properly conducted), *aff'd* 32 F.3d 690 (2d Cir.1994). Moreover, even if the survey is accepted, it

cordingly, the Court cannot find the *Vaudable* exception applicable here.

### B. *Impressa Perosa's Counterclaim Pursuant to 15 U.S.C. § 1120 Must Be Dismissed Because Any False Representations Were Not Material to the Registration*

Impressa Perosa's second counterclaim, pursuant to 15 U.S.C. § 1120, alleges that Buti made "false and fraudulent representations to the Patent and Trademark Office." Impressa Perosa asserts that, in filing their trademark application, plaintiff Buti made the false representations that (i) "Fashion Cafe" was not being used in commerce by other persons and (ii) Buti had a right to register "Fashion Cafe" as his trademark. (Counterclaims ¶ 54.)

15 U.S.C. § 1120 establishes a private right of action for anyone injured by "[a]ny person who shall procure registration in the Patent and Trademark Office of a mark by a false or fraudulent declaration or representation." [13] "A registered mark may be cancelled based upon misstatements in a trademark application if the plaintiff demonstrates that the statements '(1) were made with knowledge of their falsity, and (2) were material to the determination to grant the application.'" *West Indian Sea Island Cotton Ass'n Inc. v. Threadtex, Inc.,* 761 F.Supp. 1041, 1052 (S.D.N.Y.1991) (quoting *Marshak v. Sheppard,* 666 F.Supp. 590, 598 (S.D.N.Y. 1987)). Stated another way, "the concept of fraud upon the Patent & Trademark Office involves a willful withholding by the applicant, with intent to deceive, of material facts which, if disclosed, would result in refusal by the Office to register the mark." *Lafont v. S.A.C.S.E.,* 228 U.S.P.Q. 589, 593 (TTAB1985) (citing *Rogers Corp. v. Fields Plastics & Chemicals, Inc.,* 176 U.S.P.Q. 280, 283 (TTAB1972)).

Even assuming that Buti had knowledge of Santambrogio's use of the Fashion Cafe mark in Milan, Santambrogio cannot show that such false statements were "material to the determination to grant the application." Since the Court has determined that Impressa Perosa had not made prior use of the mark "Fashion Cafe" in the U.S., Buti had the right to use that mark in the United States, and the Patent and Trademark Office would have awarded the trademark to Buti in any event. Indeed, in *Lafont v. S.A.C.S.E.,* the TTAB held, on nearly identical facts, that:

> Because the question of who had the superior right to U.S. registration was not affected by respondent's knowledge of petitioner's European use and registration, we cannot conclude from this record that respondent's statement in its applications was an attempt to deceive the Office by withholding material facts which would lead to a refusal to register respondent's marks. *Even if the Examining Attorney had been aware of respondent's European use and registration, this would not have led to a refusal of registration, because these facts are immaterial to the issue of respondent's right to register in the U.S.*

228 U.S.P.Q. at 593 (emphasis added). *See also Bonaventure Assoc. v. Westin Hotel Co.,* 218 U.S.P.Q. 537, 540–51 (TTAB1983) (U.S. registrant of a trademark did not obtain registration fraudulently despite the fact that applicant had knowledge of use of the mark in Canada, because "mere knowledge" of existence of foreign corporation's use of same name "can hardly equate to fraudulent registration of the same mark in the United States.").

Thus, even if Buti should have revealed his alleged knowledge of Impressa Perosa's use of the Fashion Cafe mark in Italy in his United States trademark application, such an omission was not "material."

---

does not help defendant's case. All of the signatories to Exhibit B are from Milan or elsewhere in Italy; none are from the United States. (*See* Santambrogio Aff.Ex. B.) Thus, the exhibit does not establish anything as to "secondary meaning" of the Milan Fashion Cafe in the United States (as opposed to Milan), which is the key issue.

**13.** 15 U.S.C. § 1120 provides that:
Any person who shall procure registration in the Patent and Trademark Office of a mark by a false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof.

## II. DEFENDANT'S STATE LAW COUNTERCLAIMS SHOULD BE DISMISSED WITHOUT PREJUDICE

Defendant's third, fourth and fifth counterclaims raise state, not federal, claims.[14]

A district court may exercise pendent jurisdiction over state law claims "whenever the federal-law claims and state-law claims in the case 'derive from a common nucleus of operative fact' and are 'such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding.' " *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 349, 108 S.Ct. 614, 618, 98 L.Ed.2d 720 (1988) (*quoting United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966)). The decision whether to exercise pendent jurisdiction, however, is within the discretion of the district court, which should consider such factors as "judicial economy, convenience, fairness and comity." *Carnegie–Mellon,* 484 U.S. at 349–50, 108 S.Ct. at 618–19; *Block v. First Blood Assocs.,* 988 F.2d 344, 351 (2d Cir.1993).

When the federal claims are dismissed before trial, the Supreme Court has stated that the District Court ordinarily should decline the exercise of jurisdiction by dismissing the state claims without prejudice. *Carnegie–Mellon,* 484 U.S. at 350 n. 7, 108 S.Ct. at 619 n. 7 ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139 ("if the federal claims are dismissed before trial ... the state claims should be dismissed as well.").

Thus, I recommend that in the exercise of its discretion, the Court dismiss defendant's pendent state law counterclaims without prejudice.

## III. BUTI'S MOTION TO STRIKE AFFIDAVITS IS GRANTED IN PART AND SANCTIONS ARE GRANTED

Plaintiff Buti has moved to strike two of defendant's affidavits and has requested sanctions.

The Court agrees that the affidavit of defendant's counsel Mr. Jaroslawicz is incompetent and impermissible to the extent it purports to set forth facts. "Attorneys' affidavits not based upon personal knowledge have been held not to comply with Rule 56(e) at least since *Automatic Radio Manufacturing Co. v. Hazeltine Research, Inc.,* 339 U.S. 827, 831, 70 S.Ct. 894, 896, 94 L.Ed. 1312 (1950), a position this court has frequently reiterated." *Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1010 (2d Cir.1986) (citing cases); *accord, e.g., Burger v. Health Ins. Plan of Greater N.Y.,* 684 F.Supp. 46, 54 (S.D.N.Y.1988); 10A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 2738 at 495–96 (2d ed. 1983).[15] Accordingly, the Jaroslawicz affidavit is struck, except for its submission of exhibits containing discovery material (the Buti and Santambrogio deposition transcripts and documents produced in discovery).

As for the Kates Affidavit, whether or not it contains hearsay, the Court need not strike it because nothing in it creates a dispute as to an issue of material fact. The Court also declines to strike defendant's counter Rule 3(g) statement.

Plaintiff's request for sanctions is *granted* to the limited extent of the reasonable cost of researching and preparing that portion of the motion to strike dealing with defense counsel's affidavit. Plaintiff's counsel shall file an affidavit, attaching contemporaneous time records, if counsel desires to pursue the sanctions request. Such affidavit must be submitted within ten days hereof and any response from defendant's counsel must be

---

**14.** Defendant's sixth counterclaim is not really a separate cause of action, but merely a request for (injunctive) relief. *See Liberty Mutual Ins. Co. v. Wetzel,* 424 U.S. 737, 743 & n. 4, 96 S.Ct. 1202, 1206 & n. 4, 47 L.Ed.2d 435 (1976); *Williams v. Walsh,* 558 F.2d 667, 670 (2d Cir.1977); Fed.R.Civ.P. 8(a)(3). Accordingly, I recommend that it be dismissed with prejudice as to defendant's federal claim and dismissed without prejudice as to defendant's state claim.

**15.** *See also, e.g., Sitts v. United States,* 811 F.2d 736, 741 (2d Cir.1987); *Beyah v. Coughlin,* 789 F.2d 986, 989 (2d Cir.1986).

**476**

submitted within 7 days thereof. (All papers shall be served on opposing counsel by hand, fax, or by next day delivery service.)

### CONCLUSION

For the reasons set forth above, plaintiff Buti is the senior user of the mark "Fashion Cafe" in the United States. I recommend that the Court grant plaintiff Buti summary judgment on its declaratory judgment claims and further recommend that the Court grant plaintiff summary judgment dismissing defendant Impressa Perosa's federal trademark claims with prejudice and state law claims without prejudice. Finally, I also recommend that the Court deny defendant Impressa Perosa's cross-request for summary judgment.

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Allen G. Schwartz, 500 Pearl Street, Room 1350, and to the chambers of the undersigned, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Schwartz. Failure to file objections may result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

Dated: New York, New York
    July 18, 1996